# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

The Prudential Insurance Company
of America,

                Plaintiff,

v.

Life Partners, Inc., Sterling Trust
Company, Irene Williams, and
Raymond Williams,

                Defendants,

and

Life Partners, Inc., and Sterling Trust
Company,

                Cross-Claimants,

v.

Irene Williams and Raymond Williams,

                Cross-Defendants,

and

Irene Williams and Raymond Williams,

                Cross-Claimants,
v.

Life Partners, Inc., and Sterling Trust
Company,

                Cross-Defendants.

Civil No. 07-3507 (DWF/SRN)

**MEMORANDUM
OPINION AND ORDER**

_____

Cinthia G. Motley, Esq., Daniel J. McMahon, Esq., and Jason M. Kuzniar, Esq., Wilson, Elser, Moskowitz, Edelman & Dicker LLP; and Patrick H. O'Neill, Jr., Esq., O'Neill & Murphy, LLP, counsel for Plaintiff.

Lynn Schmidt Walters, Esq., and Timothy P. Tobin, Esq., Gislason & Hunter LLP - Minneapolis, counsel for Defendants, Cross-Claimants, and Cross-Defendants Life Partners, Inc., and Sterling Trust Company.

Michael G. Phillips, Esq., Law Office of Michael G. Phillips, counsel for Defendants, Cross-Claimants, and Cross-Defendants Irene Williams and Raymond Williams.
_____

## INTRODUCTION

This matter is before the Court pursuant to a Motion for Summary Judgment brought by Life Partners, Inc. ("Life Partners"), and Sterling Trust Company ("Sterling Trust") and pursuant to a Motion for Summary Judgment brought by Irene and Raymond Williams (the "Williamses"). The case initially came before the Court as an interpleader action brought by The Prudential Insurance Company of America ("Prudential") arising from a dispute regarding the distribution of proceeds from a life insurance policy issued on the life of Joshua Jericho, the Williamses' son. Jericho purportedly transferred the beneficiary rights of the $220,000 policy to Life Partners and Sterling Trust in exchange for a payment of $39,373.00.

In a Final Decree of Interpleader dated February 1, 2008, the Court held that Prudential had deposited $231,357.20 with the Clerk of Court, that Prudential was discharged from any and all liability arising out of the Policy, and that the Claimants (Life Partners, Sterling Trust, and the Williamses) were restrained and enjoined from instituting

any proceedings against Prudential with regard to the Policy.  (Final Decree of Interpleader, Doc. No. 27, Feb. 1, 2008.)  Thus, the Court dismissed Prudential from this case with prejudice, allowing the remaining Claimants to litigate their claims without Prudential's involvement.  (*Id*.)

Life Partners then brought its Motion for Summary Judgment as to the Williamses' claims of entitlement to the proceeds of the Policy.  (Doc. No. 28.)  In response, the Williamses filed a Motion for Summary Judgment.  (Doc. No. 40.)  At oral argument on this matter, the Court denied the Williamses' Motion for Summary Judgment.  For the reasons set forth below, the Court grants Life Partners' and Sterling Trust's Motion for Summary Judgment.

## BACKGROUND

On approximately August 29, 2003, Jericho completed an application to sell his life insurance policy through the Life Settlement Alliance, Inc.  (Walters Aff. Ex. B (the "Settlement Application").)  Jericho lived in Atlanta, Georgia, at the time of the application and up until his death.  According to Life Partners and Sterling Trust, Jericho had, at some point, contacted a viatical settlement broker who represented Jericho's interest in finding competing bids to purchase the policy.  (Affidavit of LaDonna Johnson ¶¶ II, III.)  The settlement broker referred the Policy to Life Partners, who bid on the Policy.  (*Id*.)[1]

---

1      According to Life Partners' Affiant, LaDonna Johnson, Life Partners purchases
                                                        (Footnote Continued on Next Page)

At the time, the Policy had a face value of $220,000.  (Aff. of Lynn Schmidt Walters ("Walters Aff.") ¶ II, Ex. A at 2.)  It appears that Jericho had previously taken out the Policy incident to his employment with Rent-A-Center, designating his mother, Irene Williams, as the beneficiary.[2]  (*Id.* at 2; Walters Aff. ¶ III, Ex. B.)  The Policy required monthly premiums of $223.60.  (*Id.*, Ex. A at 2.)

The Settlement Application indicated that Jericho's primary physician was Stephen Kagan.  (*Id.*, Ex. B.)  It included what is purported to be Jericho's signature, next to the signature of a witness by the name of Wayne Alston.  (*Id.*)

Also on August 29, 2003, Jericho signed an Authorization for Disclosure of Protected Health Information.  (Walters Aff. ¶ IV, Ex. C.)  That document was also signed by Wayne Alston, who was listed as Jericho's "Personal Representative" and "Uncle."  (*Id.*)

On September 3, 2003, Stephen Kagan, Jericho's physician, signed an Attending Physician's Statement of Competency, attesting that Jericho was "under no constraint or undue influence and [] of sound mind and competent to conduct his/her own affairs."

---

(Footnote Continued From Previous Page)
insurance policies on behalf of a group of investors who provide the capital for the purchase.  After the viatical settlement takes place, the investors pay the premiums on the policy until the insured dies.  Sterling Trust is listed as the beneficiary of the policies, but Sterling Trust only holds the death benefits in trust to later distribute to the investors.  (Aff. of LaDonna Johnson at ¶¶ II-IV.)  Life Partners and Sterling Trust are both Texas corporations with their principal places of business in Texas.

2      It is not clear from the record when Jericho initially purchased the life insurance

(Footnote Continued on Next Page)

(Walters Aff. ¶ V, Ex. D.)  On that preprinted Life Settlement Alliance form, Kagan noted that Jericho had been diagnosed with HIV in 1987.  (*Id.*)

In a letter dated September 12, 2003, Dr. Donald Cassidy, M.D., submitted to Life Partners a medical evaluation for Jericho.  (Decl. of Michael G. Phillips ("Phillips Decl.") ¶ 3, Ex. 2.)  In that letter, Dr. Cassidy stated that after having reviewed Jericho's medical records, his evaluation was as follows:

> The patient is a 34 year old male who tested HIV positive in 1987. He was diagnosed with probable Pneumocystis caranii pneumonia in April of 2003.  He also has been diagnosed, at some unspecified time in the past, with Kaposi's sarcoma.  As of August of 2003, he was receiving antiretroviral therapy with Epivir, Zerit and reyataz.  He previously had been treated with Kaletra, Viread, AZT, DDI, Viramune, Norvir, Viracept, Ziagen, Sustiva, Trizivir, Fortovase and Crixivan.  Prophylactically he takes Bactrim DS, Zithromax and Diflucan.
>
> He has additional problems of hypogonadism, vitamin B-12 deficiency, anxiety, depression, chronic sinusitis, diarrhea, thrush, a history of syphilis, fatigue, a history of pancreatitis, and a history of alcoholic hepatitis.  He is known to be hepatitis B surface antibody positive by antigen negative.  He also has a positive CMV serology.  He additionally has problems with gastro-esophageal reflux disease.  His additional medications consist of testosterone, vitamin B-12, Allegra, Prevacid, Percocet and Lexapro.
>
> His most recent blood work is from August of 2003.  At that time his CBC showed a normal white count, a normal absolute neutrophil count, a normal hemoglobin and a normal platelet count, a normal absolute neutrophil count, a normal hemoglobin and a normal platelet count.  His comprehensive metabolic panel showed potassium low at 3.31, AST high at 41, ALT high at 67 and otherwise normal values.  His amylase was high at 131.  His lipase was high at 64.
>
> There are 3 viral loads in these records, the first from January of 2003 of 435,374 copies, the second from April of 2003 of 306,736 copies,

---

(Footnote Continued From Previous Page)
policy.

> and the last from July of 2003 of 190,345 copies.  The patient's CD4 count
> ranges from a high of 60 in February of 2002 to a low of 22 in July of 2003.
> This is the last CD4 count in the records.

(*Id.*)  Dr. Cassidy concluded by stating that on the basis of these records, he put Jericho in

the six- to twelve-month life expectancy range.  (*Id.*)

On October 2, 2003, Jericho executed a Prudential Application for Conversion of

Group Life Insurance.  (Walters Aff. ¶  VI, Ex. E.)  The purpose of this form was to

convert the Policy into an individual whole-life policy.  The Application for Conversion

was signed by Joshua Jericho and witnessed by Wayne Alston.  (*Id.*)

On October 3, 2003, Jericho signed a document acknowledging that the advance

premium payment that he was receiving from the Life Settlement Alliance would be

deducted from the proceeds he would ultimately receive from Life Partners.  (*Id.* ¶ VII,

Ex. F.)

On November 17, 2003, Prudential notified Jericho that Prudential had approved

Jericho's conversion.  (*Id.* ¶ VIII, Ex. G.)  Prudential sent the converted policy to Jericho

via a letter dated December 1, 2003.  (*Id.* ¶ IX, Ex. H.)

Subsequently, Jericho submitted to Prudential a Request to Change

Ownership/Beneficiary signed by Jericho on December 2, 2003.  (*Id.* ¶ X, Ex. I.)  This

document directed that the ownership of the Policy be changed to Life Partners, Inc., and

designated the policy beneficiary as "Sterling Trust Co. Escrow Agent."  (*Id.*)

Jericho signed a Viatical Settlement Purchase Agreement on December 3, 2003.

(*Id.* at ¶ XI, Ex. J.)  This Viatical Settlement Purchase Agreement provided that in

exchange for $39,373.00, Jericho agreed to assign and transfer all right, title, and interest

in the Policy to Life Partners.  (*Id.*)  The Viatical Settlement Purchase Agreement noted:

> This Agreement was entered into in the State of Texas and its validity,
> construction, interpretation and legal effect shall be governed by the laws
> and judicial decisions of that state.  Any action at law or in equity arising
> under this Agreement shall be filed only in an appropriate State or Federal
> Court in the State of Texas.  The Parties hereby consent and submit to the
> personal jurisdiction and venue of such Courts for the purpose of litigating
> any such action.

(*Id.* at LPST0037.)  The Viatical Settlement Purchase Agreement relieved Jericho of any

further duty to make premium payments on the Policy.  (*Id.*)  The Viatical Settlement

Purchase Agreement also allowed Jericho a fifteen-day period after the closing date

during which he could rescind the Agreement.  (*Id.*)

On December 3, 2003, Jericho also signed an Affidavit, attesting:

> I am above the age of twenty-one, am mentally competent, have had the
> opportunity to receive the assistance of legal counsel in making this
> affidavit and swear that the averments made herein are true and correct.

> Because of my medical condition and financial needs, I have entered into a
> viatical settlement of my life insurance under policy no. B4111515 issued
> by Prudential Ins Co of America, whereby I have conveyed and assigned all
> of my right, title and interest in said policy to Life Partners, Inc. as agent for
> its Clients.

> I understand and am fully aware that this transaction will result in the
> former beneficiaries under this policy, being changed to Sterling Trust Co.
> or other designee of the new owner.  I further understand and am fully
> aware that the above-referenced former beneficiaries shall hereafter neither
> have nor retain any interest whatsoever in said policy (unless I have
> retained a beneficial interest in such policy).

> I have entered into this transaction after much consideration and after the
> opportunity to consult with independent counsel.  I feel that this transaction

> is the best method to meet my current needs and I hereby revoke and/or
> waive all rights for myself, my estate, the former beneficiaries and any
> other party to challenge or contest the viatical settlement or any interest in
> said policy as against the aforementioned new owner of said policy, its
> successors or assigns.

(*Id*. at LPST0046.)  The Affidavit was notarized.

Subsequently, the proceeds that were payable to Jericho as a result of the Viatical

Settlement Purchase Agreement were put into escrow and held during the rescission

period.  (*Id*. at LPST0039.) After the rescission period ended, the Policy was changed to

reflect Life Partners as the owner of the policy and Sterling Trust as the Beneficiary.  (*Id*.

¶ XII, Ex. K.)  Life Partners continued to make the premium payments on the Policy.

Jericho died of end stage HIV disease on November 23, 2006.  (*Id*. ¶ XIII, Ex. L.)

On December 4, 2006, the Williamses, both Minnesota residents, wrote to Prudential in

an attempt to claim the proceeds of the Policy.  (*Id*. ¶ XIV, Ex. M.)  The parties

exchanged correspondence and ultimately this litigation ensued.

In their Cross-Claim, Life Partners and Sterling Trust assert that the Policy was

transferred to Life Partners as owner and that Sterling Trust was validly named as the new

beneficiary of the Policy.  In the Williamses' Cross-Claim, the Williamses contend that

Life Partners is not entitled to the Policy proceeds.  Specifically, the Williamses assert

that Life Partners violated the Minnesota Viatical Settlement Act, Minn. Stat. § 60A.971,

that Jericho was incompetent and that the consideration paid to Jericho was inadequate.

The Williamses contend that the viatical settlement is a contract of adhesion and

unconscionable as a matter of law, and that Life Partners will be unjustly enriched if the

Policy proceeds are paid to Life Partners.

## DISCUSSION

### I.     Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank*, 92 F.3d at 747.  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

**II.     The Validity of the Viatical Settlement**

Life Partners and Sterling Trust have moved for summary judgment, asserting that the ownership of the Policy was effectively transferred to Life Partners and a valid change of beneficiary was made naming Sterling Trust as a beneficiary, and that the Williamses have not offered sufficient evidence to support the conclusion that the transaction was not conducted in an arm's-length fashion or that Jericho was not competent to enter into the transaction.  Life Partners and Sterling Trust assert that Texas law should be applied to determine the validity of the viatical settlement agreement.

As a preliminary matter, the Williamses contend that Minnesota law applies to this case.  The Court finds that there is absolutely nothing in the record before the Court to support the application of Minnesota law.  The only connection between this case and Minnesota is that Irene Williams, who once was named a beneficiary to the Policy, lives in Minnesota. The Williamses were not parties to the transaction between Jericho and Life Partners.  Jericho had no other connection with Minnesota, aside from Minnesota being his residence approximately seventeen years prior to the viatical settlement.  By all accounts, Jericho was living in Atlanta, Georgia, at the time he signed the viatical settlement and at the time of his death.  Clearly, Minnesota law does not apply.

In a diversity case, a federal district court applies the choice-of-law rules of the forum state.  *Allianz Ins. Co. of Can. v. Sanftleben*, 454 F.3d 853, 855 (8th Cir. 2006).  Minnesota courts traditionally enforce the parties' contractual choice-of-law provisions.  *Hagstrom v. American Circuit Breaker Corp.*, 518 N.W.2d 46, 48 (Minn. App. 1994).

Here, the Viatical Settlement Purchase Agreement specifies that Texas law governs the

enforcement of the agreement.  (Walters Aff. ¶ XI, Ex. J at LPST0037.)  The Court notes,

however, that even if it declined to apply Texas law, Georgia law would apply to

determine the validity of the viatical settlement because Jericho was a Georgia resident

when he entered into the Viatical Settlement Agreement.  Regardless of which law is

applied, there is no substantive difference between Georgia and Texas law with regard to

the claims at issue here.

###     A.    Unconscionability

The Williamses assert that the viatical settlement agreement was unconscionable

as a matter of law.  The Williamses contend that the amount of consideration that Life

Partners paid for the life insurance policy was inadequate based on Minnesota statutory

standards[3] and the amounts customarily paid in the industry.  In addition, the Williamses

assert that the viatical settlement was an illegal adhesion contract.[4]

A contract is defined as unconscionable "because of its overall one-sidedness or

the gross one-sidedness of one of its terms."  *Pony Express Courier Corp. v. Morris*, 921

S.W.2d 817, 821 (Tex. Ct. App. 1996); *see also NEC Techs., Inc. v. Nelson*, 478 S.E.2d

---

[3]     As noted above, Minnesota law does not apply.

[4]     The Williamses' argument regarding an illegal adhesion contract appears to merge
with their discussion of unconscionability.  (*See* Defs. Irene Williams and Raymond
Williams Mem. of Law in Opp. to Life Partners' and Sterling Trust's Mot. for Summ. J.
and in Supp. of the Williams' Cross-Motion for Summ. J. at 22.)  As a result, the Court
will only address the Williamses' arguments regarding unconscionability.

769, 771 (Ga. 1996) (noting that the basic test for determining unconscionability rests on determining whether the clauses "are so one-sided as to be unconscionable under the circumstances existing at the time of the contract").  Both Georgia and Texas law recognize two types of unconscionability.  Procedural unconscionability addresses the process of making the contract; substantive unconscionability looks to the fairness of the contractual terms themselves.  *NEC Technologies*, 478 S.E.2d at 771; *see also Wilcox v. Valero Refining Co.*, 256 F.Supp.2d 687, 690 (S.D. Tex. 2003) (citing *In re Halliburton Co.*, 80 S.W.3d 566, 672 (Tex. 2002)).  In determining whether a contract is procedurally unconscionable, courts look to factors such as the age, education, intelligence, business acumen and experience of the parties, their relative bargaining power, the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of meaningful choice.  *NEC Techs.*, 478 S.E.2d at 772 (citations omitted).  As to the substantive unconscionability analysis, courts look to the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns.  *Id.*; *see also Wade v. Austin*, 524 S.W.2d 79, 86 (Tex. App. 1975).

Here, the Williamses point to Jericho's HIV and accompanying illnesses and to the disparity between the amount that Jericho was paid and the face value of the Policy as evidence of the viatical settlement's unconscionability.  Considering the totality of the circumstances involved in the viatical settlement agreement, the Court finds that the viatical settlement was not procedurally or substantively unconscionable as a matter of

law.  The Williamses have set forth no evidence of coercion or duress.  Jericho's own

doctor provided the opinion that Jericho was competent to conduct his own affairs at the

time he entered into the agreement, and Jericho signed an affidavit attesting that he had an

opportunity to consult with an attorney.  Certainly, Life Partners had a relatively stronger

business acumen, being a company that routinely handled such transactions.  Yet by all

accounts, Jericho bargained for the exchange—he approached Life Partners through a

broker in an attempt to liquidate the proceeds of his life insurance policy.  There is no

evidence before the Court that Jericho was forced into the agreement.  Moreover, there is

no evidence before the Court to demonstrate that the terms of the viatical settlement,

including the amount that Jericho would be paid, were concealed from Jericho.  At any

time prior to the expiration of the rescission period, Jericho could have determined that

the clearly stated terms of the viatical settlement were not what he had contemplated and

he could have withdrawn from the agreement.  Although the amount that Jericho

ultimately received in exchange for the Policy proceeds was far less than Minnesota law

would allow, and although the Court does not condone the conduct of Life Partners and

Sterling Trust, the Court recognizes that Jericho did receive $39,373.  If Jericho had not

completed the viatical settlement, he would have died having received no proceeds from

the Policy—those proceeds would have gone to his mother, the beneficiary.  Considering

the totality of circumstances in the record before the Court, the Court finds that the

viatical settlement was not  so one-sided as to render it unconscionable as a matter of law.

### B.      Statutory Validity under Texas or Georgia Law

As noted above, because there is no basis to apply Minnesota law to the

transaction at issue here, the Minnesota Viatical Settlement Act did not apply to

invalidate the viatical settlement.  The Court also finds that neither Georgia nor Texas

statute prohibited the viatical settlement at the time it was made.

The Texas Insurance Code provides that an insurer may pay an accelerated death

benefit under an individual or group term life insurance policy or certificate if (1) the

insurer verifies that the insured has a terminal, long-term care, or other illness that is

likely to cause permanent disability or premature death, such as AIDS; and (2) the amount

of the accelerated benefit is deducted from the amount of the death benefit and any

amount the insured would otherwise be entitled to convert to an individual contract.  Tex.

Ins. Code Ann. § 1111.052.  The Texas Code does not prescribe a minimum benefit level

to be paid out to an insured.

The Viatical Settlement Agreement complied with the minimal requirements of

Texas law.  Life Partners verified Jericho's illness via the Acknowledgement Form signed

on December 3, 2003, by which Jericho attested to having "a catastrophic or life

threatening illness."  (Walters Aff. Ex. J at LPST0038.)  The $39,373.00 accelerated

benefit was deducted from the amount of the death benefit.  Thus, the Viatical Settlement

Agreement was not invalid under the minimal requirements of Texas law.

At the time the viatical settlement agreement was made, Georgia law would not

yield a different result from Texas law.  Georgia law did not regulate such settlements

14

until November 5, 2005, after Jericho signed the viatical settlement agreement.  Ga. Code Ann. § 33-59-1; *see also* Ga. Const. Art. I, § 1, ¶ X (prohibiting retroactive application of laws impairing the obligation of contract).  Thus, the result under Georgia law would be the same.

For the reasons stated, **LET IT BE ORDERED** that:

1.      The Motion for Summary Judgment brought by Irene and Raymond Williams (Doc. No. 40) is **DENIED**.

2.      The Motion for Summary Judgment brought by Life Partners, Inc., and Sterling Trust Company (Doc. No. 28) is **GRANTED**.

3.      The Clerk of Court is respectfully directed to release the amount held from Prudential's interpleader action ($231,357.20) to Life Partners and/or Sterling Trust on May 21, 2008.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  May 8, 2008                       s/Donovan W. Frank
                                          DONOVAN W. FRANK
                                          Judge of United States District Court